# 25-1941(L)

**25-2088(CON), 26-872(CON), 26-874(CON)**

*To Be Argued By*:
ANDREW M. THOMAS

# United States Court of Appeals

**FOR THE SECOND CIRCUIT**

**Docket Nos. 25-1941(L), 25-2088(CON), 26-872(CON), 26-874(CON)**

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

SUNG KOOK (BILL) HWANG, PATRICK HALLIGAN,

*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## SUPPLEMENTAL BRIEF FOR THE UNITED STATES OF AMERICA

JAMES M. MCDONALD,
*United States Attorney for the Southern District of New York,*
*Attorney for the United States of America*
26 Federal Plaza, 37th Floor
New York, New York 10278
(212) 637-2200

ALEXANDRA N. ROTHMAN,
SAMUEL P. ROTHSCHILD,
ANDREW M. THOMAS,
NATHAN REHN,
*Assistant United States Attorneys,*
*Of Counsel*

# TABLE OF CONTENTS

PAGE

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . 1

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . 3

A. Bank Losses. . . . . . . . . . . . . . . . . . . . . . . . 4

B. The Restitution Proceedings . . . . . . . . . . . . 9

C. The Disclosure Regarding the Law Clerk . 14

D. The Motions to Vacate the Restitution Orders . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

ARGUMENT:

The District Court Correctly Denied the Defendants' Motions to Vacate Their Restitution Orders . . 17

A. Applicable Law . . . . . . . . . . . . . . . . . . . . . 17

B. Discussion . . . . . . . . . . . . . . . . . . . . . . . . . 20

1. Neither the Restitution Process nor the Law Clerk's Future Employment Created the Appearance of Partiality . . . . . . . . 21

2. Because an Informed Reasonable Observer Would Not Question the District Court's Impartiality, Recusal Was Not Warranted. . . . . . . . . . . . . . . 26

3. Even Assuming a Violation of Section 455, Vacatur Is Not Warranted . . . . . 32

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

PAGE

## TABLE OF AUTHORITIES

*Cases*:

*Apple v. Jewish Hosp. & Med. Ctr.*,
829 F.2d 326 (2d Cir. 1987) . . . . . . . . . . . . . . . . . 19

*Cobell v. Norton*,
237 F. Supp. 2d 71 (D.D.C. 2003) . . . . . . . . . . . . 20

*Da Silva Moore v. Publicis Groupe*,
868 F. Supp. 2d 137 (S.D.N.Y. 2012) . . . . . . . . . . 19

*Dekom v. Nassau Cnty.*,
595 F. App’x 12 (2d Cir. 2014) . . . . . . . . . . . . . . . 26

*ExxonMobil Oil Corp. v. TIG Ins. Co.*,
44 F.4th 163 (2d Cir. 2022) . . . . . . . . . . 20, 33, 35

*First Interstate Bank of Arizona, N.A. v. Murphy, Weir & Butler*,
210 F.3d 983 (9th Cir. 2000) . . . . . . . . . . . . . 29, 30

*Hall v. Small Bus. Admin.*,
695 F.2d 175 (5th Cir. 1983) . . . . . . . . . . . . . . . . 29

*Hamid v. Price Waterhouse*,
51 F.3d 1411 (9th Cir. 1995) . . . . . . . . . . . . . 30, 31

*In re Aguinda*,
241 F.3d 194 (2d Cir. 2001) . . . . . . . . . . . . . . . . . 19

*In re Drexel Burnham Lambert, Inc.*,
861 F.2d 1307 (2d Cir. 1988) . . . . . . . . . 18, 19, 25

*Liljeberg v. Health Servs. Acquisition Corp.*,
486 U.S. 847 (1988) . . . . . . . . . . . . . . . . . . . . . . . . 20

PAGE

*Liteky v. United States*,
510 U.S. 540 (1994). . . . . . . . . . . . . . . . . . . . . . . . . 18

*Litovich v. Bank of Am. Corp.*,
106 F.4th 218 (2d Cir. 2024) . . . . . . . . . . . . . . . . . 35

*Marcus v. W2007 Grace Acquisition I, Inc.*,
No. 15 Civ. 6242 (KBF), 2017 WL 6398619
(S.D.N.Y. Sept. 13, 2017) . . . . . . . . . . . . . . . . . . . 26

*Mathis v. Huff & Puff Trucking, Inc.*,
787 F.3d 1297 (10th Cir. 2015) . . . . . . . . . . . . . . . 27

*McCann v. Communications Design Corp.*,
775 F. Supp. 1506 (D. Conn. 1991) . . . . . . . . . 19, 20

*McCulloch v. Hartford Life & Acc. Ins. Co.*,
No. 01 Civ. 1115 (AHN), 2005 WL 3144656
(D. Conn. Nov. 23, 2005). . . . . . . . . . . . . . . . . . . . 30

*Miller Indus., Inc. v. Caterpillar Tractor Co.*,
516 F. Supp. 84 (S.D. Ala. 1980) . . . . . . . . . . . . . 28

*United States v. Amico*,
486 F.3d 764 (2d Cir. 2007) . . . . . . . . . . 18, 20, 34

*United States v. Bayless*,
201 F.3d 116 (2d Cir. 2000) . . . . . . . . . . . . . . 19, 25

*United States v. Carlton*,
534 F.3d 97 (2d Cir. 2008) . . . . . . . . . . . . . . . . . . 17

*United States v. Martinez*,
446 F.3d 878 (8th Cir. 2006) . . . . . . . . . . . . . . . . 27

*United States v. Morrison*,
153 F.3d 34 (2d Cir. 1998) . . . . . . . . . . . 19, 25, 34

PAGE

*United States v. Rechnitz*,
75 F.4th 131 (2d Cir. 2023) . . . . . . . . . . . . . . . . . 32

*United States v. Thompson*,
76 F.3d 442 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . 19

*United States v. Wedd*,
993 F.3d 104 (2d Cir. 2021) . . . . . . . . . . . . . . . . . 18

*Statutes, Rules & Other Authorities:*

15 U.S.C. §§ 78i(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . 2

15 U.S.C. §§ 78j(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 1962(d). . . . . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 3663A(a)(2) . . . . . . . . . . . . . . . . . . . . 13, 23

18 U.S.C. § 3664(g)(1) . . . . . . . . . . . . . . . . . . . . . . . . 23

18 U.S.C. §§ 1343 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

28 U.S.C. § 455(a). . . . . . . . . . . . . . . . . . . . . . . . . passim

17 C.F.R. § 240.10b-5 . . . . . . . . . . . . . . . . . . . . . . . . . 2

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

**Docket Nos. 25-1941(L), 25-2088(CON), 26-872(CON), 26-874(CON)**

---

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

SUNG KOOK (BILL) HWANG, PATRICK HALLIGAN,

*Defendants-Appellants.*

---

## SUPPLEMENTAL BRIEF FOR THE UNITED STATES OF AMERICA

---

### Preliminary Statement

Sung Kook (Bill) Hwang and Patrick Halligan appeal from an order entered on March 24, 2026, in the United States District Court for the Southern District of New York, by the Honorable Alvin K. Hellerstein, United States District Judge, denying their motions to vacate the restitution orders that were entered against them following a nine-week trial and multipart sentencing hearings.

Superseding Indictment S1 22 Cr. 240 (AKH) (the "Indictment") was filed on January 18, 2024, in eleven

counts. Count One charged Hwang and Halligan with racketeering conspiracy, in violation of 18 U.S.C. § 1962(d). Count Two charged Hwang with securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. § 240.10b-5, and 18 U.S.C. § 2, in connection with a market manipulation scheme. Counts Three through Nine charged Hwang with market manipulation, in violation of 15 U.S.C. §§ 78i(a)(2) and 78ff, and 18 U.S.C. § 2, each count in connection with a specific security. Count Ten charged Hwang and Halligan with securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. § 240.10b-5, and 18 U.S.C. § 2, in connection with a scheme to defraud counterparties. Count Eleven charged Hwang and Halligan with wire fraud, in violation of 18 U.S.C. §§ 1343 and 2.

Trial commenced on May 8, 2024, and ended on July 10, 2024, when Hwang was convicted on Counts One through Six and Eight through Eleven, and was found not guilty on Count Seven; and Halligan was convicted on Counts One, Ten, and Eleven.

On July 22, 2025, the District Court sentenced Hwang principally to a term of 216 months' imprisonment and to pay restitution in the amount of $9,409,521,514.76, and sentenced Halligan principally to a term of 96 months' imprisonment and to pay restitution in the amount of $3,136,507,171.59.

In August 2025, Hwang and Halligan filed notices of appeal. On December 2, 2025, Hwang and Halligan filed in the District Court motions to vacate the restitution orders against them. On March 24, 2026, the District Court denied those motions. Hwang and

Halligan appealed those denials, and this Court consolidated that appeal with the principal appeal.

Hwang and Halligan have been released on bail pending appeal.

## Statement of Facts

The evidence at trial showed that Hwang led one of the largest securities fraud schemes in history and that Halligan participated in the scheme. Using his private hedge fund, Archegos Capital Management, Hwang manipulated the prices of multiple publicly traded securities through abusive and deceptive trading practices. Additionally, Hwang obtained financing for his market manipulation scheme by means of fraudulent misrepresentations to Archegos's counterparties. Hwang's schemes successfully distorted market prices for numerous publicly traded stocks, temporarily inflating the value of his portfolio from less than $2 billion to more than $35 billion. Hwang's schemes collapsed in March 2021 when he exhausted Archegos's financial resources attempting to counteract negative market movement in the firm's largest positions, defaulting on his margin loans and leaving his counterparties with billions in losses.

The facts of Hwang's and Halligan's schemes are detailed in the Government's brief in the principal appeal. This brief focuses on the facts relevant to Hwang's and Halligan's motions to vacate their restitution orders.

### A. Bank Losses

During the defendants' schemes, eight investment banks—BMO, Credit Suisse, Jefferies, Macquarie, Morgan Stanley, MUFG, Nomura, and UBS—acted as trading counterparties with Archegos.[1] The counterparties agreed to facilitate swap trades with Archegos pursuant to various contracts, such as ISDA master agreements, which are credit agreements used to trade derivatives. (*See, e.g.*, GX 319; Tr. 1890).[2] Through an ISDA, a counterparty bank and its client establish "a bilateral relationship" for trading derivatives. (Tr. 2627).

The counterparty victims agreed to provide Archegos with the ability to trade financial instruments

---

1 As proven at trial, Archegos had other counterparties and prime brokers, too, including Deutsche Bank, Goldman Sachs, and Wells Fargo, that did not seek restitution. The facts here relate to those financial institutions that suffered losses because of the defendants' misconduct and for which the defendants were ordered to pay restitution.

2 "Tr." refers to the trial transcript; "GX" refers to a Government trial exhibit; "Supp. Br." refers to the joint supplemental brief filed by Hwang and Halligan on appeal of the orders denying their motions to vacate their restitution orders; "RA" refers to the appendix filed with that brief; and "Dkt." refers to an entry on the District Court's docket for this case. Unless otherwise noted, quotations omit internal quotation marks, citations, and alterations.

known as total return swaps. A total return swap is a derivative financial instrument that exposes both parties to changes in price of an underlying equity security. (Tr. 610, 1559-60). Hwang used these swap contracts to place large, concentrated, and highly leveraged trades in a handful of securities. (GX 475). Hwang's trades necessarily exposed the banks to the same economic risks that he took, but in the opposite direction. So, for example, if Archegos entered into a swap position that increased in value with a rise in the price of the underlying stock, the counterparty's swap position would have a corresponding decrease in value. The magnitude of each party's risk grew as the stock price moved further from the price that prevailed at the time the swap began.

Such a swap also exposes each party to the risk that the other party will not pay amounts due at the end of the contract. That is, if Archegos had a position that declined in value because the underlying stock moved against Archegos, then the bank's position would have a corresponding increase in value, but the bank would face the risk that Hwang and his fund would be unable to cover the losses at the end of the contract.

Because of the risks posed by a trading relationship, the counterparty banks engaged in diligence to decide whether to begin, continue, and expand business relationships with a hedge fund client, such as Archegos. Brian Fairbanks, who worked at UBS during the relevant period, testified that UBS performed a risk evaluation on clients "[b]efore they came in the door" to size up the risks of accepting a new client. (Tr. 115). At other counterparties, too, such diligence

was "part of the underwriting process" (Tr. 1674) because, regardless of the specific trades that a client might make, the counterparty-client relationship fundamentally involved the bank extending credit (in the form of either loans, market exposure, or both) to the client to facilitate the client's trading. A BMO employee framed the stakes simply: "We're the lender, so if they run out of the money they're potentially going to lose our money. So I want to make sure they are taking prudent steps to protect the money they have because if they lose more than they have, they are essentially losing our money as the lender." (Tr. 1816). Among other things, information about the client's portfolio, liquidity, available cash, and regulatory history figured into the banks' assessments about whether and how to do business with a client like Archegos. (*E.g.*, Tr. 116, 119, 707, 1815).

Further, unlike Hwang and Archegos, Archegos's counterparties did not speculate on future market movements in particular stocks; rather, the counterparties provided the swaps to Hwang in order to profit from service and financing charges on the swap transactions. (Tr. 1558). Accordingly, when Hwang entered into a swap transaction with a counterparty, the counterparty would hedge its exposure to the underlying stock price by executing a mirror transaction in the underlying stock. (Tr. 1557-58). The purpose of the hedge was to insulate the bank from exposure to the stock price. For example, if Archegos put on a swap position that would rise if the stock price increased, the bank would hedge by purchasing the underlying stock. Thus, if the stock price did increase, the bank would owe Archegos money on the swap at the end of the

contract, but the bank's losses on the swap would be covered because the bank would be able to sell the underlying stock at a higher price as well. By the same token, if Archegos's position fell, Archegos would owe money to the bank, which would be offset by the fact that the bank would be holding the stock at a loss.

These equity trades were a functional precondition to the formation of the swap and provided the reference price against which the swap's later performance was measured: "Once that hedge was complete, then, and only then, would the swap be written on that exposure." (Tr. 1556). These equity purchases enabled the counterparty to guarantee that it would be able to sell the stock at the end of the swap period and perfectly offset any appreciation (or depreciation) in the value of a specific stock that would be owed to (or by) Archegos. (Tr. 1557-58).

The equity purchases did not, however, remove the counterparties' credit risk from trading with Archegos. If a swap moved against Archegos, then the equity shares were necessarily worth less than the bank had originally paid to obtain them. The banks therefore faced no upside benefit from holding the stock—that was promised to Archegos—and they depended on Archegos to pay what it owed on the swap to offset any downside risk that the stock price would decline. To offset the possibility of losses, counterparties required Archegos to post margin collateral, the size of which fluctuated with market performance. (Tr. 1882). The various ISDA and trading contracts anticipated that if Archegos did not post margin as required, it would default on its trading arrangement. (Tr. 3507). As

Fairbanks explained, a default would trigger the end of the swap:

> If the client defaults and runs out of money, we are left having to unwind, what we call unwind a swap, which is terminating the swap, but then we have the hedge, the physical shares we actually have to go and sell into the market. And that's where the loss comes into play. So we're unwinding that hedge, we're selling the stock to get out of the swap, the contract we wrote.

(Tr. 117).

During the week of March 21, 2021, multiple securities in Archegos's portfolio declined in value. Though Hwang tried to manipulate his way back to profitability, he ultimately failed. (*See* GX 3056N). Hwang's efforts expended all of Archegos's available cash and left the firm by midweek without margin to post to the banks to sustain its swaps. (GX 3745R). Eventually the banks declared Archegos in default of its contractual obligations. (*E.g.*, Tr. 738-39, 1177-78, 1694, 1744, 1850). Those defaults triggered Archegos's responsibility to pay what it owed under the swaps and to pay back all outstanding loans. As anticipated by the contracts, and as expected by Archegos, the counterparties then seized Archegos's posted collateral and closed out the hedges that had been purchased to create the swaps in the first place. (Tr. 556 ("[B]y receiving this [default notice], we knew that at least Credit Suisse in this case was positioning themselves to . . . force the

sale of some securities that were in the Archegos fund."); Tr. 1744-45, 3508).

Most of the counterparties suffered substantial losses when Archegos defaulted. Archegos was unable to make the payments it owed, the counterparties sold their hedge positions at a loss, and the capture of Archegos's posted margin was not enough to make up the difference. (*E.g.*, Tr. 1744-54). Indeed, the situation was exacerbated because Hwang and Halligan's fraudulent schemes had included their deception about how concentrated Archegos was in the same stocks across trades with multiple counterparties. As a result, the counterparties discovered in trying to unwind the positions that each of the other counterparties held many of the same large and concentrated positions, contrary to what Archegos had previously led the counterparties to believe. (*E.g.*, Tr. 219-20, 235, 1909-13). This impaired the counterparties' ability to unwind those positions without depressing prices further. Scott Becker, Archegos's Director of Risk Management, summarized the result bluntly: When asked, "[W]hat happened to those billions of dollars that the banks had lent to Archegos?," Becker responded, "They could not be paid back. It was gone." (Tr. 805).

### B. The Restitution Proceedings

As required by the Mandatory Victims Restitution Act, the Government sought restitution for any victim with computable losses suffered as a direct and proximate result of the defendants' schemes. These victims fell into two groups: (a) Archegos counterparties that suffered losses from their business dealings with

Archegos, and (b) innocent Archegos employees whose deferred compensation amounts were lost as part of the schemes, because the defendants' conduct was the direct and proximate cause of both the counterparties' losses and the losses of the innocent Archegos employees. (Dkt. 340; Dkt. 384).

The Government supported its restitution request with evidence from the trial record and materials supplied by the victims reflecting out-of-pocket losses. (*E.g.*, Dkt. 340; Dkt. 371). Numerous counterparty and individual victims drafted victim impact statements, which they sent to the Government and the Government subsequently shared with the Court and the defendants. (*E.g.*, Dkt. 371). The defendants opposed restitution, principally arguing that the Court had an insufficient record and that calculating restitution would be too burdensome. (*See, e.g.*, Dkt. 343; Dkt. 360; Dkt. 366).

The District Court held a series of sentencing hearings. On November 20, 2024, Judge Hellerstein conducted an initial sentencing proceeding for Hwang, at which Judge Hellerstein identified questions he had regarding restitution for the employees. (Dkt. 349 at 74). With regard to restitution for counterparties, Judge Hellerstein listed the full amounts claimed by the counterparties, and the defense objected that these numbers included the losses incurred on the hedge transactions. Judge Hellerstein initially indicated that he agreed with that objection, stating that "losses on hedges are not to be counted." (RA-92). In response, the Government argued that the hedges were a necessary part of the overall swap transactions, and that, if

losses on hedges were not counted, then, "by the same token, Archegos ought not be credited for the profitable sale of hedges." (RA-92). The District Court then directed the parties to make additional submissions regarding the issue of restitution to the counterparties. (RA-94).

The following day, on November 21, 2024, the District Court continued the sentencing proceeding for Hwang but did not return to the issue of restitution, focusing instead on other matters. (Dkt. 347 at 103).

In advance of the District Court's next hearing, the parties made detailed additional sentencing submissions regarding restitution, including the issue of restitution to counterparties. The Government's submission drew on the trial evidence to argue that the counterparties' hedging transactions were an integral part of the swap transactions with Archegos, and that the counterparties were not in the business of exposing themselves to the prices of individual stocks and thus would not have entered into these hedging transactions except in connection with the swap transactions with Archegos. (Dkt. 361 at 15-18, 24-26).

On December 19, 2024, the District Court held a third sentencing hearing for Hwang and again took up the issue of restitution. (Dkt. 376 at 6-7). At this proceeding, Judge Hellerstein noted that, at the prior hearing, he had "tentatively ruled" that the losses from the hedges should not be included in restitution, but said his tentative prior ruling had been "incorrect." (RA-108). Judge Hellerstein then explained that the "hedge was performed simultaneously with the creation of the swap agreement and was part and parcel of

the same thing," and that the purpose of it was so that the banks were "hedged against the market risk, but they assumed the credit risk." (RA-109). Because the "credit risk" in dealing with Archegos was part of what Hwang had defrauded the counterparties about, the overall losses from these transactions, including the hedging losses that were "part and parcel" of the transactions, should be included. (RA-109).

The District Court heard from the defense as it reiterated the argument that restitution was not appropriate for the losses from the hedging transactions. (Dkt. 376 at 19). Judge Hellerstein rejected that argument, noting that the trial record contradicted the defendants' arguments about the role of hedging transactions in relation to Archegos's swaps:

> As I've said before, there is testimony in the record as to how this happened, uncontradicted testimony; that the transaction is the entity involved with the swap agreement itself—the hedge against the agreement, and it is designed to protect the counterparty against market risk but not as to credit risk. And it's a credit risk that was the subject of the false and misleading statements that caused the counterparty to lend in the first instance, and this was the result of the liquidation that occurred when the bubble created by the false and misleading statements was pierced.

(RA-111-12).

On January 8, 2025, the Government updated the District Court by letter that, following the December 19, 2024 hearing, several former Archegos employees had contacted the Government to request that they too be included in the restitution order. (Dkt. 378). The District Court entered a schedule for the submission of supplemental restitution claims and the filing of any objections to those claims. (Dkt. 379). On January 27, 2025, Judge Hellerstein held a sentencing hearing for Halligan, again deferring final determination of restitution. (*See* Dkt. 394 at 3).

On March 12, 2025, Judge Hellerstein referred to the Honorable Barbara Moses, United States Magistrate Judge for the Southern District of New York, "the determination of which former Archegos employees are 'victims' for purposes of restitution under 18 U.S.C. § 3663A(a)(2), and how much restitution each is entitled to." (Dkt. 401). To determine those matters, Judge Moses held an evidentiary hearing in two phases, the first on May 9, 2025, and the second on May 21, 2025. Judge Moses issued a report and recommendation, which the District Court adopted on July 2, 2025. (Dkt. 445).

On July 22, 2025, Judge Hellerstein held a final sentencing hearing for Hwang and Halligan. On July 29, 2025, the District Court entered restitution orders against Hwang and Halligan. (Dkt. 453; Dkt. 454). Ultimately, restitution was awarded to eight Archegos counterparties, including Morgan Stanley, and dozens of former employees. On August 7, 2025, the District Court entered judgment against Hwang (Dkt. 458),

and on August 26, 2025, the District Court entered judgment against Halligan (Dkt. 463).

### C. The Disclosure Regarding the Law Clerk

On October 16, 2025, Davis Polk submitted a letter to Judge Hellerstein, with copies to the parties, to provide notice, pursuant to Rule 1.12 of the New York Rules of Professional Conduct, that Davis Polk was screening one of Judge Hellerstein's former law clerks (the "Law Clerk") from participating in Davis Polk's work for Morgan Stanley in connection with this matter. (RA-145). Although Davis Polk had not entered a notice of appearance in the case, Davis Polk had represented Morgan Stanley, a victim, and prepared victim impact statements on Morgan Stanley's behalf. (*E.g.*, RA-95). Davis Polk's October 16, 2025 letter explained that the Law Clerk worked for Judge Hellerstein from September 2024 to October 2025, and would join Davis Polk as an associate on October 20, 2025. (RA-145). The letter went on to say, "We are informed that [the Law Clerk] participated in [Judge Hellerstein's] chambers' work on" this matter. (RA-145).

After receiving the October 16, 2025 letter, counsel to Hwang and Halligan each contacted Davis Polk. In response to counsel's inquiries, Davis Polk explained that the Law Clerk was a summer law clerk at Davis Polk in 2023, and that, in July 2023, at the end of the summer program, the Law Clerk received and accepted an offer to join Davis Polk in the fall of 2024, but, in January 2024, the Law Clerk deferred that employment to clerk for Judge Hellerstein from the fall of

2024 to the fall of 2025. (RA-148). Davis Polk further noted:

> As a summer associate, [the Law Clerk] was not involved in any work at Davis Polk involving [this] matter. [The Law Clerk]'s offer of employment as an associate at Davis Polk was not contingent upon nor related to any involvement [the Law Clerk] may have had with [this matter] as a clerk for Judge Hellerstein. [The Law Clerk's] compensation at Davis Polk is not contingent upon nor related to any involvement [the Law Clerk] may have had with [this matter] as a clerk for Judge Hellerstein. There are no communications between [the Law Clerk] and the attorneys representing Morgan Stanley in connection with [this matter].

(RA-151).

### D. The Motions to Vacate the Restitution Orders

On December 2, 2025, Hwang and Halligan moved to vacate the restitution orders, citing 28 U.S.C. § 455(a). (Dkt. 467; Dkt. 468). The defendants argued that the Law Clerk's commitment to employment with Davis Polk was an apparent conflict of interest that undermined confidence in the fairness of the restitution proceedings. (Dkt. 468 at 1).

On March 24, 2026, the District Court denied the motions to vacate the restitution orders. (RA-157). Judge Hellerstein concluded that: (i) the Law Clerk's future employment did not create an appearance of

bias; and (ii) even if there were an appearance of bias, vacatur would not be warranted. (RA-161, 164).

In support of the first conclusion, the District Court explained that: (1) "[t]he asserted conflict involved the Law Clerk's later employment with a law firm representing a third-party victim, not a party to the case" (RA-162); (2) "[t]here is no evidence that [Morgan Stanley] was treated differently" than any of the other seven counterparties that sought restitution (RA-162); (3) "[t]here is no evidence that the [L]aw [C]lerk worked on the matter before, or after, [the Law Clerk's] one-year [clerkship]" (RA-162); (4) the calculation of restitution for the counterparties was relatively "straightforward" in comparison to the calculation of restitution for the Archegos employees (RA-163); and (5) "Davis Polk did not actually appear in the matter or directly submit materials to the Court" but instead "provided its victim impact statement to the Government for submission and for the Government's proposed calculations of restitution" (RA-163 n.1).

In support of the second conclusion, the District Court explained that each of the following three risks was low. "[T]he risk of injustice to the parties [wa]s low" because the $740 million restitution award to Morgan Stanley "[wa]s a fraction of a much larger $9.4 billion restitution order," and the defendants were ordered to "pay the amount due to the former Archegos employees prior to paying the banks." (RA-164). The risk of "injustice in other cases" was low because "a law clerk's future employment with a third party . . . whose involvement is limited to a victim impact statement does not represent a major risk of conflict." (RA-164).

And "the risk of undermining public confidence in the judicial process" was low because "[a] law clerk's future employment with a law firm representing a third-party victim in a case would not cause an objective disinterested person to question the partiality of a judge." (RA-165).

# ARGUMENT

## The District Court Correctly Denied the Defendants' Motions to Vacate Their Restitution Orders

The District Court acted within its discretion in denying the defendants' motions to vacate their restitution orders on the basis of an alleged violation of Section 455. As an initial matter, there was no such violation. The Law Clerk's future employment did not create an appearance of bias because a reasonable person with knowledge of all the facts and circumstances of this matter would not harbor doubts about the District Court's impartiality in calculating restitution. Moreover, even if there had been a violation of Section 455, vacatur would not have been required. The facts of this case give rise to very low risks of injustice to the parties, of injustice in other cases, and of undermining confidence in the judicial process. The order denying the motions to vacate the restitution orders should be affirmed.

### A. Applicable Law

This Court "review[s] a district court's decision to deny a recusal motion for abuse of discretion." *United*

*States v. Carlton*, 534 F.3d 97, 100 (2d Cir. 2008); *United States v. Amico*, 486 F.3d 764, 773 (2d Cir. 2007). This Court "rarely disturb[s] a district court's decision not to recuse itself." *United States v. Wedd*, 993 F.3d 104, 114 (2d Cir. 2021); *see also In re Drexel Burnham Lambert, Inc.*, 861 F.2d 1307, 1312, 1314 (2d Cir. 1988) (because the district judge "is in the best position to appreciate the implications of those matters alleged in a recusal motion," reversal of a decision denying a recusal motion is an "extraordinary remedy" requiring a showing that the district court "indisputably abused its discretion.").

Title 28, United States Code, Section 455(a), requires a federal judge to "disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a). Disqualification under Section "455(a) is triggered by an attitude or state of mind so resistant to fair and dispassionate inquiry as to cause a party, the public, or a reviewing court to have reasonable grounds to question the neutral and objective character of a judge's rulings or findings." *Liteky v. United States*, 510 U.S. 540, 557-58 (1994) (Kennedy, J., concurring). The test for disqualification under this section is whether there is an appearance of a wrongful or inappropriate bias or prejudice, not whether the judge actually harbored such a bias or prejudice against a party or his counsel. *See id*. at 548 (majority opinion).

The test is an objective one. *See Drexel*, 861 F.2d at 1313. In determining whether there is an appearance of bias or partiality, a judge must consider whether a reasonable person knowing and understanding all of

the relevant facts and circumstances would harbor doubts as to the judge's impartiality. *See, e.g.*, *Apple v. Jewish Hosp. & Med. Ctr.*, 829 F.2d 326, 333 (2d Cir. 1987); *see also United States v. Bayless*, 201 F.3d 116, 126 (2d Cir. 2000) (whether "an objective, disinterested observer fully informed of the underlying facts" would "entertain significant doubt that justice would be done absent recusal"). An alleged disqualifying interest that is remote, contingent, or speculative is not sufficient to reasonably call into question the judge's impartiality. *See Drexel*, 861 F.2d at 1313; *see also United States v. Morrison*, 153 F.3d 34, 48 (2d Cir. 1998) ("Where an interest is not direct, but is remote, contingent, or speculative, it is not the kind of interest which reasonably brings into question a judge's impartiality."); *United States v. Thompson*, 76 F.3d 442, 451 (2d Cir. 1996) ("Disqualification is not required on the basis of remote, contingent, indirect or speculative interests."). "It is vital to the integrity of the system of justice that a judge not recuse himself on unsupported, irrational or highly tenuous speculation, and he is as much obliged not to recuse himself when it is not called for as he is obliged to when it is." *McCann v. Communications Design Corp.*, 775 F. Supp. 1506, 1523 (D. Conn. 1991) (citing *Drexel*, 861 F.2d at 1312); *accord In re Aguinda*, 241 F.3d 194, 201 (2d Cir. 2001) ("[W]here the standards governing disqualification have not been met, disqualification is not optional; rather, it is prohibited.").

Judges are presumed to be impartial. *See McCann*, 775 F. Supp. at 1522; *see also Da Silva Moore v. Publicis Groupe*, 868 F. Supp. 2d 137, 150 (S.D.N.Y. 2012) ("[M]ovants must overcome a presumption of

impartiality, and the burden for doing so is substantial."). Thus, the party moving for disqualification has a substantial burden to overcome that presumption. *See, e.g.*, *McCann*, 775 F. Supp. at 1522. The movant must produce clear and convincing evidence that the court should be disqualified pursuant to Section 455. *See Cobell v. Norton*, 237 F. Supp. 2d 71, 79 (D.D.C. 2003).

Even where a violation of Section 455(a) may have occurred, vacatur does not automatically follow. *See Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 864 (1988). Instead, courts in this Circuit consider three factors "in determining how best to address a violation of § 455(a)." *Amico*, 486 F.3d at 777. These factors are: "(i) the risk of injustice to the parties in the particular case; (ii) the risk that the denial of relief will produce injustice in other cases, and (iii) the risk of undermining the public's confidence in the judicial process." *Id.* (citing *Liljeberg*, 486 U.S. at 863); *see ExxonMobil Oil Corp. v. TIG Ins. Co.*, 44 F.4th 163, 173 (2d Cir. 2022) (explaining "it is preferable for a court reviewing a potential violation of § 455(a) to explicitly discuss how the factors from *Liljeberg* apply"). "While not a traditional harmless-error analysis, this test looks to the relative harm to the parties, the public, and the judicial process." *Amico*, 486 F.3d at 777.

### B. Discussion

As explained in the Government's principal brief, the restitution orders in this case, which were entered after multiple rounds of briefing and argument, were reasonable estimates of the victims' losses and amply

supported by the record, including the extensive evidence at trial. Now, the defendants claim that the restitution orders were "tainted" (Supp. Br. 28) because one of Judge Hellerstein's law clerks had accepted an offer of future employment from a law firm that was counsel to one of the counterparty victims. That argument is based on exactly the type of remote, contingent, and speculative reasoning that is not an appropriate ground for recusal under Section 455. Notably, the defendants have failed to identify any case with similar facts in which recusal was required, and they misstate the record in order to exaggerate the potential for an ethical conflict. In any event, even assuming for the sake of argument that there had been a violation of Section 455, no vacatur is warranted.

### 1. Neither the Restitution Process nor the Law Clerk's Future Employment Created the Appearance of Partiality

The defendants' arguments on appeal rest on the conjecture that the District Court and the Law Clerk were specifically aware that the Law Clerk's future employer had a client with an interest in this matter and did nothing to address it. But the defendants point to no evidence of that, dispelling from the start the suggestion that Judge Hellerstein's "impartiality might reasonably be questioned." 28 U.S.C. § 455(a). Davis Polk did not represent a party, no attorney from Davis Polk ever entered an appearance in the case or was counsel of record, the firm did not appear at any proceeding, and its lawyers did not speak in court. The only way in which the District Court or the Law Clerk would have learned that Davis Polk had any

connection to the restitution dispute was by taking note of the letterhead of Morgan Stanley's victim impact statements, which were originally submitted to the Government and which the Government provided to the Court along with the statements of multiple other victims. (Dkt. 351). The defendants thus grossly exaggerate the circumstances when they presume that Judge Hellerstein "abandoned" ordinary procedures and "failed to follow the ethical rules." (Supp. Br. 16, 23). There is simply no evidence that the District Court or the Law Clerk was even aware of Davis Polk's involvement.

The defendants compound their hyperbole by suggesting that "Judge Hellerstein unexpectedly reversed himself, without explanation." (Supp. Br. 13.). That misstates the record. At the November 20, 2024 sentencing hearing, Judge Hellerstein issued a tentative ruling regarding the inclusion of the counterparties' hedging losses in the restitution orders, and then invited the parties to make written submissions regarding the counterparty losses. (RA-92-94). The Government then filed a detailed submission citing extensive trial evidence about the interrelationship between the hedges and the swap transactions. (Dkt. 361). Following that submission, at the December 19, 2024 hearing, Judge Hellerstein adopted the Government's reasoning and provided a detailed explanation for doing so. (RA-108-09).

The District Court's reasoning mirrored the arguments made by the Government, which drew on the trial record. *Compare* RA-109 (Judge Hellerstein explaining: "The banks did not wish to participate for

their own investment and risk. They participated in order to earn fees and interest, interest on their margin loans, fees on the swap agreements. And so the hedge was performed simultaneously with the creation of the swap agreement and was part and parcel of the same thing. That meant that the banks assumed the credit risk."), *with* Dkt. 361 at 25 (Government arguing: "[N]one of the counterparties would have traded in the equities underlying Archegos's swaps if Archegos had not executed swaps referencing those securities. . . . Archegos's counterparties traded in equities solely because Archegos sought to engage in swaps trades, not because they had some investment view on the merits of Archegos's stock picks.")). Notably, neither the arguments about hedges in the Government's sentencing submission nor the District Court's ruling on this issue referenced the victim impact statements. Thus, the defendants' suggestion that Davis Polk "secured [for Morgan Stanley] nearly three quarters of a billion dollars from the [defend]ants with minimal effort" (Supp. Br. 16) bears no relationship to the actual record.

In short, the District Court determined which losses to include based on the trial evidence and the parties' arguments. This is exactly the procedure contemplated by the restitution statute, which makes clear that a victim is entitled to restitution of losses caused by the crime, regardless of whether the victim even participates in the restitution proceedings. *See* 18 U.S.C. § 3664(g)(1) ("No Victim shall be required to participate in any phase of a restitution order."); *see also id.* § 3663A. And the Law Clerk had no involvement—and, indeed, was not working for the District

Court—during the nine-week trial at which most of the evidence relevant to restitution was admitted.

For the period of the sentencing proceedings when the Law Clerk did work for the District Court, the defendants have adduced no evidence that the Law Clerk had any substantive involvement in those proceedings. And their suggestion that the Law Clerk would have had any reason to intervene is untethered to the facts. At the time of the clerkship, the Law Clerk, who had "no communications" with "the attorneys representing Morgan Stanley in" this matter (RA-151), was slated to join Davis Polk, a law firm "[w]ith more than 1,000 lawyers around the globe" (https://www.davispolk.com/about/overview), as a junior associate whose employment at the firm and compensation were "not contingent upon nor related to any involvement [the Law Clerk] may have had with this matter" (RA-151).

The defendants' claims are further undermined by other aspects of the restitution orders, which make clear that Davis Polk did not "secure[ ]" any payments to Morgan Stanley. (Supp. Br. 16). First, neither Morgan Stanley nor any other counterparty victim has received any money from the defendants, and, given the District Court's decision to prioritize the restitution claims of the individual victims, it will likely be years before Morgan Stanley receives any restitution, if it ever receives any at all. Second, the District Judge applied a consistent conceptual framework to all counterparty victims. The defendants were ordered to pay the same types of losses, computed in the same fashion, to Morgan Stanley as to the other counterparties.

Morgan Stanley's roughly $740 million award represented less than 8% of Hwang's overall roughly $9.4 billion restitution obligation, and Morgan Stanley's award was only the fourth largest of the eight counterparties that were awarded restitution—the largest award was nearly $5 billion, and the second largest was over $2.6 billion. The defense posits that Morgan Stanley may have been treated favorably because it is a longstanding client of Davis Polk's. (Supp Br. 16-17). The record does not support that view; the appearance is that Morgan Stanley was treated just the same as every other counterparty victim, and in keeping with the trial evidence and the Government's arguments about the counterparties' losses.

In light of this procedural and factual context, it strains credulity to argue that Davis Polk's limited (and likely unnoticed) involvement in the restitution process would cause a reasonable person to harbor doubts about the District Judge's impartiality in imposing restitution because of the Law Clerk's future employment with the firm. The defendants' alleged disqualifying interests are "remote, contingent, [and] speculative," *Morrison*, 153 F.3d at 48, and "an objective, disinterested observer fully informed of the underlying facts" would *not* "entertain significant doubt that justice would be done absent recusal," *Bayless*, 201 F.3d at 126. Far from "indisputably abus[ing] its discretion," *Drexel*, 861 F.2d at 1314, therefore, the District Court acted well within that discretion to deny Hwang's and Halligan's motions to vacate their restitution orders.

### 2. Because an Informed Reasonable Observer Would Not Question the District Court's Impartiality, Recusal Was Not Warranted

Because the record does not support the defendants' speculative assertions that the Law Clerk had significant substantive involvement in decision-making in a way that would reasonably call into question the District Court's impartiality, the District Court's denial of the motions to vacate the restitution orders was in line with precedent and should be affirmed. This case is like *Dekom v. Nassau Cnty.*, 595 F. App'x 12 (2d Cir. 2014), where this Court, in affirming the district court's denial of the plaintiffs' recusal motion, held that the "[p]laintiffs' vague allusion on appeal to a conversation with a law clerk that plaintiffs considered questionable creates no possibility that a reasonable person, knowing all the facts, would conclude that the judge's impartiality could reasonably be questioned." *Id.* at 15.

Similarly, in *Marcus v. W2007 Grace Acquisition I, Inc.*, No. 15 Civ. 6242 (KBF), 2017 WL 6398619 (S.D.N.Y. Sept. 13, 2017), *aff'd sub nom. Marcus as Tr. of Grace Preferred Litig. Tr. v. Smith*, 755 F. App'x 47 (2d Cir. 2018), the "plaintiffs s[ought] relief from the judgment on the basis that the clerk for the district court judge . . . violated 28 U.S.C. § 455(a), by failing to recuse himself because a law clerk working on the case had been a summer associate for counsel for defendants, and subsequently became associated with that firm." *Id.* at *1. The district court found no error in the failure to recuse, reasoning:

> [W]hile the circumstances attending the prior summer employment of the law clerk suggest that it would have been better not to have had him work on the case, there is absolutely no basis to suggest that as a result of his summer employment the district judge violated 28 U.S.C. § 455(a). The docket of this case reflects significant personal involvement by the district court judge, including several hearings and extensive oral argument. Based upon the judge's personal comments at those proceedings, the decision of the district court judge should have come as no surprise to the plaintiffs' counsel—and plainly reflected his personal decision making. It appears that the information regarding the clerk's employment has been used opportunistically.

*Id.*; *see also Mathis v. Huff & Puff Trucking, Inc.*, 787 F.3d 1297, 1310-13 (10th Cir. 2015) (no appearance of partiality arose from law clerk's ministerial, in-court work); *United States v. Martinez,* 446 F.3d 878, 883 (8th Cir. 2006) (same).

So too here. The District Judge had significant personal involvement in the restitution proceedings and engaged in extensive discussion with the parties regarding the issues of counterparty losses across multiple hearings. (*See, e.g.*, Dkt. 349; Dkt. 376). Moreover, this case furnishes a record even stronger than the one in *Marcus* to affirm the denial of vacatur. Unlike in

*Marcus*, where there was an employment relationship between the law clerk and counsel for one of the *parties* to the action, here, the employment relationship was between the Law Clerk and counsel for a *victim*, not a party. The defendants attempt to elide that distinction by arguing that "any improper benefit to Morgan Stanley was a corresponding detriment to them" (Supp. Br. 22), but that misses the point. The question is not whether the impact of any bias was felt by a party; rather, the question is whether there was any bias or appearance of bias in the first place, and the answer to that question is less likely to be "yes" if the alleged disqualifying interest involves a third party as opposed to a party to the action.

Notably, the defendants do not cite *Dekom* or *Marcus*. And none of the authorities that they do cite dictates vacatur here. Only two of those cases found a law clerk's conflict disqualifying, and both are distinguishable.

In *Miller Indus., Inc. v. Caterpillar Tractor Co.*, 516 F. Supp. 84, 88 (S.D. Ala. 1980), a case arising out of the Southern District of Alabama, the judge's law clerk, while clerking, accepted an offer of post-clerkship employment with the firm that represented the plaintiff, and then continued to work on the case. The court determined that "the law clerk's continued participation in the case after he had accepted employment with [the plaintiff]'s law firm mandate[d] disqualification of the trial judge." *Id.* at 90. Here, by contrast, there is no allegation that the Law Clerk, while working on this matter, accepted employment with counsel representing any of the parties to the action.

Instead, the allegation is that the Law Clerk, while working on this matter, had deferred employment with counsel representing a nonparty victim—and there is no indication that the Law Clerk even knew about that representation.

The Fifth Circuit's decision in *Hall v. Small Bus. Admin.*, 695 F.2d 175 (5th Cir. 1983), is even further afield. There, not only did the law clerk, while clerking, accept employment with counsel for the plaintiff in a class action, but also the law clerk was a member of the plaintiff class and had, before her clerkship, "expressed herself as convinced of the correctness of its contentions." *Id.* at 176-77. Here, by contrast, the alleged conflict arose from the Law Clerk's then-future employment with counsel for a nonparty victim, and there is no allegation either that the Law Clerk had any personal stake in the outcome of the matter, or that the Law Clerk came into their clerkship with a preconceived notion of how the matter should resolve. To the contrary, as Davis Polk confirmed in their email to the defense, the Law Clerk was not involved in this matter before starting their clerkship, and the Law Clerk's "compensation at Davis Polk is not contingent upon nor related to any involvement [the Law Clerk] may have had" with this matter as a clerk for the District Court. (RA-151).

A third case that the defendants cite, *First Interstate Bank of Arizona, N.A. v. Murphy, Weir & Butler*, 210 F.3d 983 (9th Cir. 2000), is also distinguishable. As in *Miller* and *Hall*, the law clerk in *First Interstate* accepted an offer of employment from counsel to an actual party in a case before the district court. The clerk

and the district judge knew about the conflict, and yet the clerk continued to work on the case, including substantive work like "mark[ing] up a memorandum relating to a[ ] . . . plan of reorganization." *Id.* at 985. Additionally, *First Interstate* was a malpractice action against the law firm that had offered employment to the law clerk, and the parties did not dispute, and thus the court did not make a finding, whether the law clerk's apparent conflict had in fact been disqualifying.

This case is closer to the cases cited by the defendants that did *not* find any error in a judge's decision not to recuse. In *McCulloch v. Hartford Life & Acc. Ins. Co.*, No. 01 Civ. 1115 (AHN), 2005 WL 3144656, (D. Conn. Nov. 23, 2005), the district judge declined to recuse where the law clerk in question went to work for a firm that allegedly represented one of the parties, not in the action at bar, but in other actions. No. 01 Civ. 1115 (AHN), 2005 WL 3144656, at *1 (D. Conn. Nov. 23, 2005). The defendants quote *McCulloch* for the proposition that "a law clerk should not participate in litigation in which his future employer appears as counsel for *one of the parties*." (Supp. Br. at 26 (emphasis added)). Here, however, Davis Polk did *not* represent one of the parties, and the defendants identified no substantive work on this matter done by the Law Clerk.

Likewise, in *Hamid v. Price Waterhouse*, 51 F.3d 1411 (9th Cir. 1995), the Ninth Circuit affirmed the *denial* of a recusal motion, reasoning:

> Because of the very large number of defendants and law firms involved in this case, the likelihood that a law clerk

> would have some sort of connection to one of them is higher than in most cases, and the likelihood that that connection would matter is lower. A reasonable observer would more likely see any relationship as implicit in the special circumstances of the complexity of the case and large number of parties and law firms involved rather than as an odd coincidence the failure to avoid which might suggest bias. The question of bias is one of whether a reasonable person with knowledge of all the facts would conclude that the judge's impartiality might reasonably be questioned. It is not a question of whether a line can be drawn connecting a person within chambers to a person or firm related, no matter how remotely, to a party in the case.

*Id.* at 1417.

As in *Hamid*, this was a complex proceeding where a large number of law firms were at least tangentially involved, making it more likely that a law clerk might have some sort of connection with one of them. If anything, the connections are more attenuated here than in *Hamid*, where one of the judge's law clerks had a professional relationship with a firm that represented an actual party to the case. Thus, the record does not demonstrate that "a reasonable person with knowledge of all the facts would conclude that the judge's impartiality might reasonably be questioned." *Id.* There is certainly no basis for this Court to

conclude that it was an abuse of discretion for the District Court to deny the defendants' motions.

Finally, the defense cites *United States v. Rechnitz*, 75 F.4th 131 (2d Cir. 2023), which involved not a law clerk's conflict, but a prior recusal issue related to the same District Judge. But "the unique facts of th[at] case," which involved "a close, near-paternal personal relationship" between the District Judge and a person who was "directly involved" in the criminal case, are patently distinguishable from the facts of this case. *Id.* at 143. In light of these obvious differences, the defendants' citation appears intended to categorically impugn the District Judge's impartiality rather than to advance an argument based on legal principles. But this Court "underscore[d] the unique set of facts presented by th[at] case, and accordingly the limited nature of [its] holding," concluding that the *Rechnitz* "record present[ed] the rare case where failure to recuse amounted to an abuse of discretion." *Id.* at 147-48. None of the concerns that arose in *Rechnitz* appear here. And the District Court ably oversaw a complicated, multi-month trial, followed by multiple rounds of sentencing and restitution advocacy, before concluding—based on the trial evidence—that the defendants owed restitution to Archegos's counterparties.

### 3. Even Assuming a Violation of Section 455, Vacatur Is Not Warranted

Even if there had been a violation of Section 455 in this case, vacatur would not be required under the three *Liljeberg* factors. *First*, absent vacatur, the risk of injustice to the parties in this case is minimal. For

all the reasons identified above, the Law Clerk's future employment with Davis Polk cannot reasonably be said to have impacted the impartiality of the restitution proceedings, but, even if it could, as noted above, Morgan Stanley's award represented a small fraction of Hwang's overall restitution obligation. Against that notion, the defendants hypothesize, with no support, a fantastical scenario where the Law Clerk was so intent on aiding his future employer's client that the Law Clerk convinced the District Judge to alter the entire approach to restitution to include losses "on the hedges." (Supp. Br. 25-26). That suggestion is not only fanciful but also belied by the record, as discussed above. The record makes clear that it was the District Judge who decided to include in restitution "losses incurred by facilitating swaps" (RA-108), based on the Government's advocacy in favor of that approach. Notably, the defendants have not even challenged the District Court's ruling on that issue on appeal and have offered no argument that crediting the counterparties for those losses was erroneous. *See ExxonMobil*, 44 F.4th at 173-74 (noting that the first *Liljeberg* factor weighed against vacatur where there was no "basis to conclude that doing so would lead to a more just outcome"). The lack of even arguable error in the District Court's ruling, combined with the comparatively small size of the restitution award to Morgan Stanley as compared to other counterparties, indicates that there is little if any risk of injustice to the parties in this case.

*Second*, the risk of injustice in other cases is even smaller. There is no compelling reason to think that the facts of this case will be replicated in others. As the

defendants themselves observe, "almost all judges surely follow" some type of "custom" "whereby if a law clerk accepts future employment with a law firm, he is immediately taken off all work in cases being tried in [his judge's] court by his prospective employers." (Supp. Br. 20). There is no persuasive reason to believe that, absent vacatur in this case, judges will depart from that custom in other cases. The defendants exaggerate when they argue that the absence of vacatur here would "establish a precedent that law clerks *can* work on cases involving their employers." (Supp. Br. 27 (emphasis in original)). In fact, an affirmance here would create no new rule and would signal nothing more than that the District Court did not abuse its discretion in declining to vacate restitution orders when subsequently alerted to a law clerk's alleged disqualifying interest that was remote, contingent, and speculative. *Morrison*, 153 F.3d at 48.

To overstate the risk of injustice in other cases, the defendants note that Judge Hellerstein was also the District Judge in *Rechnitz* and in *United States v. Javice*, No. 23 Cr. 251 (AKH) (S.D.N.Y.). But the second *Liljeberg* factor is directed toward the circumstances of the particular case, with an eye to whether these circumstances warrant vacatur to "insure that, in the future, defendants will experience trials conducted differently." *Amico*, 486 F.3d at 777. This factor is not an invitation to consider whether the same District Judge has faced calls for recusal in other cases. As described above, the facts of *Rechnitz* are a far cry from those of this case, and it is difficult to see why an affirmance here would in any way undermine the clear message that this Court sent district court judges in the

*Rechnitz* opinion. And as the defendants themselves note, the *Javice* case is also currently on appeal, and the Court will have an opportunity to consider the circumstances of that case after full briefing and argument. (Supp. Br. 28). In light of that pending appeal, there is plainly no need to use this case as an opportunity to address the circumstances presented in *Javice*.

And *third*, the risk of undermining the public's confidence in the judicial process is remote. Even if the alleged disqualifying interest here rose to the level of a violation of Section 455(a) (and it does not), for all the reasons discussed above, that violation is not sufficiently serious to warrant vacatur on the basis of undermining confidence in the judicial system. In support of the contrary view, the defendants cite *Litovich v. Bank of Am. Corp.*, 106 F.4th 218 (2d Cir. 2024), where this Court "f[ound] that there [wa]s a legitimate risk that *these kinds of violations* will undermine" such confidence. *Id.* at 227 (emphasis added). But the "kinds of violations" at issue in *Litovich* were financial conflicts between the judge and a party: There, "[the district judge]'s wife owned [the defendant's] stock for at least part of the time that [the judge] presided over th[e] case." *Id.* at 225. That "kind[ ] of violation" is very different from the one allegedly at issue in the instant case, where the supposed interest is with a law clerk (not the judge's spouse), a victim (not a party), and future employment at a law firm (not a direct ownership interest in a litigant). What would undermine confidence in the justice system here is not an affirmance, but rather the vacatur of restitution orders that were the product of extensive litigation over multiday

sentencing proceedings following a nine-week jury trial, where the victims of the defendants' crimes have already been forced to wait years for any recompense. *See ExxonMobil*, 44 F.4th at 174 ("The public also has an interest in speedy adjudication of disputes, an interest that would not be furthered by forcing the parties to re-brief the same issues for a third time.").

## CONCLUSION

**The order denying the motions to vacate the restitution orders should be affirmed.**

Dated: New York, New York
August 18, 2026

Respectfully submitted,

JAMES M. MCDONALD,
*United States Attorney for the Southern District of New York,*
*Attorney for the United States of America.*

ALEXANDRA N. ROTHMAN,
SAMUEL P. ROTHSCHILD,
ANDREW M. THOMAS,
NATHAN REHN,
*Assistant United States Attorneys,*
*Of Counsel.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel hereby certifies that this brief complies with the type-volume limitation of the Federal Rules of Appellate Procedure and this Court's Local Rules. As measured by the word processing system used to prepare this brief, there are 8,799 words in this brief.

JAMES M. MCDONALD,
*United States Attorney for the Southern District of New York*

By: NATHAN REHN,
*Assistant United States Attorney*